IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COLLEEN E. SCHICKEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 14 C 5763 |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | Magistrate Judge Finnegan |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Colleen E. Schickel seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. § 416. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief explaining why the case should be remanded. Defendant responded with a motion for summary judgment in support of affirming the decision to deny benefits. After careful review of the record, the Court denies Defendant's motion and remands the case for further proceedings.

## PROCEDURAL HISTORY

Plaintiff applied for DIB on July 3, 2011, alleging that she became disabled on June 30, 2010 due to bipolar disorder, a Chiari malformation,[1] post-traumatic stress

---

[1] A Chiari malformation is a brain defect in which brain tissue extends into the spinal canal. *Chiari Malformation*, WebMD, http://www.mayoclinic.org/diseases-conditions/chiari-malformation/basics/definition/con-20031115 (last visited Nov. 16, 2015). Severe headaches are a typical symptom. *Symptoms*, WebMD, http://www.mayoclinic.org/diseases-conditions/chiari-malformation/basics/symptoms/con-20031115 (last visited Nov. 16, 2015).

disorder ("PTSD"), fibromyalgia, and chronic pain. (R. 221, 252). She later supplemented this list of impairments with cervical radiculopathy (and other conditions not relevant to the Court's review). (*See* R. 339). The Social Security Administration denied Plaintiff's application initially on December 19, 2011, and again upon reconsideration on April 18, 2012. (R. 132, 139). She then filed a timely request for a hearing and appeared before Administrative Law Judge Michael Hellman (the "ALJ") on January 20, 2013. (R. 39-97). The ALJ heard testimony from Plaintiff, who was represented by counsel, and vocational expert Steven Sprower (the "VE"). On June 11, 2013, the ALJ found that Plaintiff was capable of light work with certain restrictions, and therefore was not disabled at any time from the alleged onset date through the date of decision. Accordingly, he denied her application for benefits. (R. 21-33).

Plaintiff identifies three bases upon which this Court should remand the decision to the Commissioner. First, she argues that the ALJ's step-four RFC determination does not rest on substantial evidence because the ALJ failed to incorporate all of her limitations and did not bridge the evidence to those limitations that he did incorporate. Second, she asserts the ALJ erred in the minimal weight he assigned to the opinion of her treating psychiatrist. Finally, she argues that the ALJ's credibility determination is insufficiently reasoned.

## **FACTUAL BACKGROUND**

Plaintiff was born on January 26, 1967, and was 46 years of age at the time of the ALJ's decision. (R. 49). She lives with her mother, has obtained a college degree, and has completed some course work toward a Master's Degree in special education. (R. 48-50, 253). Prior to her application for benefits, she worked in a range of short-

term positions, including as a teacher, administrative aide, cashier, executive assistant, animal bather, office manager, and library assistant. (R. 51-56, 253). She left the work force in spring 2010 when she was laid off as a result of budget cuts at the school where she had been working. (R. 50, 252). It appears, however, that she held a handful of brief positions after this time. (*See, e.g.*, R. 430, 434).

## A. Medical History

Plaintiff's medical records reflect treatment for both physical and psychiatric conditions over a course of several years. Over those years, she saw several different doctors for the same conditions, and it is not always evident what prompted her to change clinics or providers.

### 1. January 23, 2009 to December 22, 2011

**Confidential Care:** The first medical report of record dates to January 23, 2009, at which time Plaintiff sought psychiatric treatment at Confidential Care in Munster, Indiana. (R. 368). She reported a history of PTSD (which stemmed from a robbery), bipolar disorder, mood disorder, and manic disorder, as well as fibromyalgia, a Chiari malformation, and a family history of psychiatric conditions. Plaintiff also stated that she took Depakote (for mood disorders) and Prozac (for depression). (R. 368-69). The Confidential Care doctor documented racing thoughts, hypersomnia, increased appetite, increased weight, increased affect, and rapid speech. (R. 370-71). Confidential Care progress notes from approximately seventeen visits in 2009 through fall 2010 (when she switched to a different health care provider) show a mostly stable condition, albeit one

that included abuse of alcohol.[2] (*See* R. 359-67).  Of particular note from these records is that, on March 27, 2010, she stated to her provider that she had lost her job and could no longer pursue her Master's Degree program.  (R. 365).

**Dr. Frim:**  On January 28, 2010, Plaintiff attended a medical appointment with David Frim, M.D., at the University of Chicago Medical Center, who she had seen on prior occasions for evaluation and monitoring of her Chiari malformation.  (R. 355).  She complained of headaches that occurred about two to three times per week, with less intensity but greater frequency than in the past, but stated she had no vision problems, lethargy, nausea, or vomiting.  (*Id.*).  Dr. Frim noted disc bulges in Plaintiff's cervical spine that likely caused shooting pain in her right leg (about which she newly complained).  (*Id.*).  He also reviewed an MRI taken the same day, which showed a type-one Chiari malformation, decreased cerebrospinal fluid flow at the foramen magnum, disc protrusions in her cervical spine, and an absence of syringomyelia (the formation of cysts in the spinal cord).  (R. 353).  He assessed that her symptoms were "no[t] serious problems" and did not require surgery, and he thus recommended that she follow up in one year for another MRI, or at any time prior at the direction of her primary care physician.  (R. 355).

**Dr. Carter:**  On September 14, 2010, Plaintiff began mental health treatment with Paul Carter, M.D., at Aunt Martha's Health Center.  (R. 392).  In his initial evaluation, Dr.

---

[2]     As the *Scott v. Astrue* court recognized, the very nature of mental illnesses like "bipolar disorder is that people with the disease experience fluctuations in their symptoms, so any single notation that a patient is feeling better or has had a 'good day' does not imply that the condition has been treated."  647 F.3d 734, 740 (7th Cir. 2011).  Although the Court errs on the side of including a greater number of details from Plaintiff's later mental health records to demonstrate the gradual change and fluctuations in her conditions (and given her assertion that the ALJ impermissibly "cherry picked" from the treatment records), it summarizes the contents of the Confidential Care records in the interest of brevity.

Carter described her as euthymic with no hypomania, in a "good" mood, but possessing only "fair" judgment and insight.[3] (R. 392-93). He noted that she also had a past history of bipolar disorder, fibromyalgia, a Chiari malformation, and alcohol abuse. (R. 392, 394). Plaintiff described her pain level as "zero" at that time. (R. 392). He diagnosed her with bipolar disorder, and also noted some symptoms of major depressive and anxiety disorders, such as fatigue, irritability, panic, generalized anxiety, and poor concentration and decision making. (R. 393). He did not alter her prescription medications, which included Depakote, Prozac, and Antabuse, and told her to return in two months. (R. 392, 422).

Plaintiff next visited Dr. Carter on November 4, 2010. (R. 391). She said that she was "very good" and he characterized her as "future-oriented." (*Id.*). He again observed a euthymic mood, although with some signs of depression, and he noted that Plaintiff's insight remained fair while her judgment was good. (*Id.*). Her pain level remained zero. (*Id.*). He instructed her to return in three months. Plaintiff did not return until April 12, 2011, at which time she told Dr. Carter that she was "good" and his observations of her, along with her mental and physical status, were essentially unchanged from the November visit. (*See* R. 390). He asked that she return in two months.

Plaintiff filed for DIB benefits on July 3, 2011. (R. 221, 252). On August 31, 2011, Plaintiff returned for her next appointment with Dr. Carter. (R. 389). She reported

---

[3]     "Insight" is "the patient's awareness and understanding of the origins and meaning of his attitudes, feelings, and behavior and of his disturbing symptoms; self-understanding." *Insight*, Dorland's Medical Dictionary, http://www.dorlands.com/defjsp?id=100053923 (last visited Nov. 16, 2015). "Judgment" means "the ability to make acceptable decisions." *See Mental Status Tests*, Healthline, http://www.healthline.com/health/mental-status-tests#Overview1 (last visited Nov. 16, 2015).

that a friend had died. Dr. Carter assessed her mood as hypomanic and impulsive, and noted that she had been depressed for nearly three weeks, although her mental status was unchanged from her last visit. He opined that she had "safety issues" and increased the dosage of Depakote. He directed her to follow up in two months. When Plaintiff returned on September 20, 2011, she complained to Dr. Carter of panic attacks, irritability, and mood instability. (R. 388). Her mental status exam revealed a decline in her judgment ability, to "fair." (*Id.*). Dr. Carter newly prescribed Abilify (an antipsychotic) to treat Plaintiff's mood problems and asked her return in two weeks. (*Id.*).

At that next visit on October 4, 2011, Plaintiff told Dr. Carter that she was experiencing feelings of irritability, pressured thoughts, and anxiety. (R. 434). She informed him that she had lost a dry-walling job. (*Id.*). Her insight and judgment remained fair, and Dr. Carter discontinued Abilify and doubled the Prozac dosage. He asked her to return in two weeks. (*Id.*). When she did so on October 18, 2011, Dr. Carter observed that she was hypomanic, irritable, and impatient. (R. 433). Her mental status exam was unchanged. He increased the dosage of Depakote and decreased the Prozac dosage. (*Id.*).

**Dr. Palacci (Consultant):** On November 8, 2011, Plaintiff attended a consultative physical examination with Liana G. Palacci, D.O., as directed by the State of Illinois Disability Determination Services (the "State Agency"). (R. 401-03). Prior to the exam, Dr. Palacci reviewed the medical files from Plaintiff's January 2010 visit with Dr. Frim (the University of Chicago neurologist). Dr. Palacci observed that Plaintiff's history of complaints included a type-one Chiari malformation, occasionally blurry vision,

vertigo and dizziness, recurrent headaches with occasional sensitivity to light, bipolar disorder, and PTSD. (R. 402). She also noted that Plaintiff had been diagnosed with fibromyalgia ten years prior and complained of generalized muscle aches, fatigue, and insomnia. (*Id.*). The physical examination was generally unremarkable. Aside from five tender points consistent with fibromyalgia, Plaintiff's systems were within normal limits. (*See* R. 403). She had full ability to stand, walk, and grip. (*Id.*). Range of motion in her hips, knees, ankles, and spine was normal, as was her strength in her upper and lower extremities. (*Id.*). She also lacked focal deficits and exhibited normal reflexes. (*Id.*).

**Dr. Johnson (Consultant):** Also on November 8, 2011, Plaintiff attended a consultative psychiatric examination for the State Agency with Kelly Johnson, M.D. (R. 410). Plaintiff described the history of her mental health conditions to Dr. Johnson, which included bipolar disorder, manic episodes, depressive symptoms, lack of motivation, racing thoughts, irritability, a feeling that she "never fit[] in," anxiety, panic attacks, and a history of PTSD. (R. 410-11). During the examination, Plaintiff was cooperative, appropriate, and free of abnormal movements and tremors, and she also exhibited normal patterns of speech and expansive affect. She did not verbalize psychosis, but did verbalize "hope for the future." (R. 412). Dr. Johnson assessed Plaintiff with chronic bipolar disorder with mixed episodes of mania and depression; chronic, recurrent, and severe major depressive disorder; and panic disorder with agoraphobia. (*Id.*). Dr. Johnson opined that Plaintiff would benefit from further psychiatric care "in light of the severity and chronicity of her symptoms." (R. 413).

One week later, on November 15, 2011, Plaintiff returned to her treating psychiatrist, Dr. Carter, and she reported that she had secured a new job, though she

was "not excited about it." (R. 432). Dr. Carter noted that she appeared motivated, but also exhibited anxiety and muscle twitches, and appeared "upset." (*Id.*). Assessing her with "mild residual anxiety/agitation," he maintained the dosage of Depakote (to "optimize" its level), re-increased the Prozac dosage (which he had decreased at the prior visit), and instructed her to return in one month. (*Id.*).

**Dr. Gilliland and Dr. Oh (Consultants):** On December 8, 2011, David Gilliland, Psy. D., and B. Rock Oh, M.D., completed consultative reports for the State Agency. (R. 104-09). Relying heavily on Dr. Johnson's exam, Dr. Gilliland opined that Plaintiff's mental health symptoms were not disabling, specifically finding that Plaintiff was limited only in her abilities to carry out detailed instructions (moderate limitation), work in coordination or proximity with others (moderate limitation), and socially interact with others. (R. 108). He further explained that Plaintiff was "mentally capable of performing short and simple tasks in a routine setting with reasonable rest periods and brief workplace social interaction." (R. 109). Dr. Oh similarly found that Plaintiff's physical ailments were not disabling. (R. 104). He opined that her fibromyalgia was "well controlled" and the Chiari malformation imposed no "severe neuro defects." (*Id.*). As far as limitations, he opined that Plaintiff was able to climb ramps and stairs only occasionally, never climb ladders or scaffolds, and should avoid concentrated exposure to hazards. (R. 105-06).

Plaintiff attended an appointment with Dr. Carter on December 22, 2011. (R. 431). He noted that although she had good coping and stress tolerance, her mood was only "okay" and she experienced tremors, increased anxiety, and stress from her job. She again exhibited fair insight and fair judgment. (*Id.*). Dr. Carter added Ativan to her

medication regimen to treat the anxiety and told her to see him again in one month. (*Id.*).

### 2. January 27, 2012 to January 10, 2013

When Plaintiff returned to Aunt Martha's on January 27, 2012, she told Dr. Carter that she had lost her job and had contemplated suicide. (R. 430). Her judgment and insight were fair. (*Id.*). Dr. Carter expressed concern for her "acute safety issues" but noted that she was motivated to "return to health." (*Id.*). He directed her to return in four days. When Plaintiff did so, on January 31, 2012, Dr. Carter noted improvement in her anxiety, mood stability, and judgment (to "good" from "fair"). (R. 429). He also observed that she was oriented toward the future and enjoyment of people and activities. She "was receptive to suggestions, [and] easily shared and cried." (R. 428). Nevertheless, therapy notes documented suicidal and homicidal ideation, hallucinations, and psychosocial stressors. (*Id.*). Dr. Carter asked Plaintiff to return in two weeks. (R. 429). Plaintiff did not present for her scheduled appointment on February 10, 2012, but next visited Aunt Martha's on March 2, 2012. (R. 427, 457). She reported that the Ativan was "very effective for [her] anxiety," and Dr. Carter noted that she appeared "better." (R. 457). Her insight remained fair and her judgment good, and he asked her to follow up in two months. (*Id.*).

**Dr. Tin and Dr. Gotanco (Consultants):** Howard Tin, Psy. D., and Reynaldo Gotanco, M.D., completed additional consultative reports for the State Agency on April 17, 2012. (R. 115-23). Dr. Tin acknowledged that Plaintiff had alleged a worsening of her psychiatric symptoms, but on the basis of treatment notes—which reflected a lack of hospitalization, lack of verbalized psychosis, and verbalization of hope for the future—

he opined that her alleged limitations were only partially credible. (R. 116). He suggested that she had moderate difficulties in social functioning, and moderate limits to her abilities to: carry out detailed instructions, work in coordination or proximity with others, interact with the general public, accept instructions or criticism from superiors, and get along with coworkers. (R. 117, 120). He concluded that she was "mentally capable of performing short and simple tasks in a routine setting with reasonable rest periods and brief workplace social interaction." (R. 122). Dr. Gotanco opined that the severity of Plaintiff's Chiari malformation and fibromyalgia were not disabling, reasoning that the fibromyalgia was "well controlled" and the malformation posed no "neuro deficits." (R. 118). He found the same exertional limitations as did Dr. Oh in December 2011. (R. 119-120).

Plaintiff returned to Aunt Martha's on May 2, 2012, at which time she reported a pain level of zero, relapse in her use of alcohol, psychosocial stressors, and a stable mood. (R. 456). Dr. Carter observed that she was "future oriented." (*Id.*). In his mental health status exam, he found that her insight was good (an improvement) but her judgment was only fair (a regression). (*Id.*). Dr. Carter told Plaintiff to discontinue her consumption of alcohol, placed her Ativan prescription "on hold," upped the dosage of Depakote, and referred her to Alcoholics Anonymous. (*Id.*).

Plaintiff next visited Aunt Martha's about two weeks later, on May 14, 2012, for a primary care visit. (R. 454). She complained of lower back and neck pain, which she rated as nine out of ten. (*Id.*). The physician noted paresthesia (tingling or prickling) and ordered lab work. (*Id.*). She was also referred to Stroger Orthopedic Clinic (for the neck and back pain). (*Id.*). During a follow-up primary care visit on May 29, 2012,

Plaintiff reported a pain level of zero. (R. 452). Plaintiff attended her next appointment with Dr. Carter on June 6, 2012, when she described depression and psychosocial stressors, and a pain level of zero. (R. 451). Dr. Carter found her judgment and insight to be only fair, and he increased the dosage of Prozac. (*Id.*).

On July 11, 2012, Dr. Carter completed a Psychological/Psychiatric Impairment Report for the State Agency. (R. 440-46). The report described Plaintiff's diagnoses and symptoms, the extent of her particular impairments, and details about Dr. Carter's course of care. The report stated that Plaintiff's use of alcohol was in early sustained remission. (R. 440). Dr. Carter also indicated that encounters with individuals and groups of people, social gatherings, work settings, and financial instability were causes or "triggers" of Plaintiff's symptoms. (R. 444). He stated that Plaintiff was "unable to keep a job" and limits her social interactions due to her illnesses. (*Id.*). He opined that, in light of her inability to secure and maintain employment, she is "unable to tolerate usual/routine daily job stressors," and she could not work in a non-sheltered work setting at that time. Sustaining work, he remarked, was a treatment goal. (R. 444-45).

**Stroger Hospital Physicians:** On July 13, 2012, Plaintiff attended an outpatient clinic appointment at Cook County's Stroger Hospital to establish care with that healthcare system. (R. 462). Although the Stroger physician noted Plaintiff's complaint of numbness in her right upper extremity, which occurred five times daily and began about four months prior, she found no weakness in Plaintiff's right upper extremity during a physical exam. (R. 462-63). On September 7, 2012, Plaintiff saw a neurologist at Stroger, to whom she complained of a years-long history of neck pain that radiated to her right arm and associated daily headaches. (R. 465). The neurologist noted that

Plaintiff took only ibuprofen as needed for pain, and diagnosed her with chronic neck pain, chronic headaches, and a Chiari malformation. (R. 465, 467). The neurologist, finding normal strength, tone, and sensation in Plaintiff's lower and upper extremities (other than reduced sensitivity in Plaintiff's upper right arm), told Plaintiff to return for a follow-up appointment after obtaining an MRI. (R. 466-67). The September 24, 2012 MRI evidenced mild degenerative changes to her spine, disc bulges in her cervical spine, and a Chiari malformation. (*See* R. 469-70).

On August 15, 2012, Plaintiff returned to see Dr. Carter at Aunt Martha's. (R. 450). She indicated that she had run out of her Depakote supply and had been irritable. (*Id.*). Nevertheless, her judgment and insight were good, and Dr. Carter told her to return in three months. (*Id.*). On November 13, 2012, Dr. Carter noted the presence of anxiety and stressors. He found that her insight and judgment were once again only fair, but he noted that she said the medications "are good." (R. 449). He instructed her to begin taking Ativan twice daily, to see her neurologist for pain, and to next visit Aunt Martha's in three months. (*Id.*).

**Stroger Specialty Care Clinic:** Records from Stroger dated November 8, 2012 indicate that Plaintiff visited the Specialty Care clinic, likely for shooting pain in her right upper extremity (the records do not state the purpose of the visit). (R. 471-73). At that time, Plaintiff was instructed to take amitriptyline (an anti-depressant that sometimes reduces pain in low doses),[4] and at a January 10, 2013 follow-up neurology appointment, the neurologist noted that the amitriptyline had greatly improved symptoms of shooting pain. (R. 478). Plaintiff also complained of frequently feeling

---

[4] *Tricyclic Antidepressants for Chronic Pain*, WebMD, http://www.webmd.com/pain-management/tricyclic-antidepressants-for-chronic-pain (last visited Nov. 16, 2015).

cold, tremors, declining vision, and prickling sensations in her back, each of which the medication did not resolve. (R. 478, 480, 482-83). She also described ongoing gait instability. (R. 478, 482). The neurologist refilled the amitriptyline prescription and told Plaintiff to return in three months, but to call should the symptoms worsen in the interim. (R. 479-80). About three weeks later, on January 30, 2013, Plaintiff appeared before the ALJ to appeal the prior denials of her applications for DIB.

## B. The ALJ's Decision

In his decision, the ALJ determined that Plaintiff has a Chiari malformation, cervical spine impairment (degenerative disc changes and stenosis), bipolar disorder, panic disorder, history of PTSD, and a history of alcohol dependence, each a severe impairment under the Agency's regulations. (R. 23). He acknowledged that Plaintiff also has fibromyalgia, but found that it posed no more than a minimal functional limitation on Plaintiff's work capabilities because it was well controlled with ongoing treatment. (R. 23-24).

The ALJ next evaluated whether Plaintiff's severe impairments met or medically equaled the severity of the impairments listed in the appendices to Subpart P of 20 C.F.R. Part 404, and he found that none of the impairments, alone or in combination, met the criteria of the relevant listings. (R. 24-26). Thereafter, the ALJ found that Plaintiff's residual functional capacity ("RFC") permitted light work with the following additional restrictions: she could not climb ladders, ropes or scaffolds but could occasionally climb stairs; she could frequently but not repetitively perform overhead reaching on her right, perform gross manipulations on her right, feel with her right upper extremity, and handle objects on her right; she must be limited to simple, routine, and

repetitive tasks in a work environment free of fast-paced production; she must have a work environment that involves only simple, work-related decisions with few, if any, changes; and she must interact only occasionally with the public, coworkers, and supervisors.  (R. 26).

In making this RFC determination, the ALJ reviewed Plaintiff's subjective complaints and allegations, her daily activities, her medical records and treatment notes, and medical opinions of Dr. Carter and the State Agency's consulting physicians and psychologists.  (R. 26-32).  He incorporated no restrictions based on Plaintiff's history of alcohol use due to evidence of remission, and none specifically related to PTSD due to a lack of support in the medical evidence for the severity she alleged.  (R. 29-30).  In assessing the opinion evidence, the ALJ accorded "little weight" to Dr. Carter's July 11 opinion that Plaintiff was unable to work in a non-sheltered work setting, reasoning that Dr. Carter had relied heavily on Plaintiff's subjective complaints and the restriction was inconsistent with his treatment notes.  (R. 31).  The ALJ also gave "some weight" to the State Agency psychologists' opinions because they were "well supported by a preponderance of the evidence" available at the time.  (*Id.*).  However, because their opinions could not account for "newly submitted documentation and evidence" about developments in Plaintiff's condition (a reference, as the Court below explains, to the Stroger records), the ALJ adopted additional restrictions beyond those that they suggested.  (R. 31-32).

The ALJ also found not credible Plaintiff's allegations as to the severity and persistence of her symptoms and the resulting limitations.  (R. 30).  Here, he pointed to her daily activities, her departure from the work force due to a layoff, her subsequent

work and efforts to find employment, her application for unemployment benefits following the alleged onset date, and improvement in her conditions with medications and other treatments. (R. 30).

Relying on the testimony of the VE, the ALJ determined at step four that Plaintiff's RFC did not permit her return to past relevant work in education, secretarial work, or cashiering. (R. 32). At step five, the ALJ again relied on the VE's testimony to find that Plaintiff's RFC would allow her to perform three different positions available in significant numbers in the national economy: bakery racker, of which there are 17,000 positions in Illinois and 316,000 nationwide; advertising material distributer, of which there are 21,000 state and 388,000 national jobs; and cleaner/housekeeper, available in sums of 19,400 in Illinois and 524,000 in the United States. (R. 33). Accordingly, the ALJ found that Plaintiff was not disabled at any time from the alleged onset date through the date of decision, and denied her application for benefits. (*Id.*).

## DISCUSSION

### A.  Standard of Review

Judicial review of the Commissioner's final decision is authorized by section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The Court's task is to determine whether the ALJ's decision is supported by substantial

evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)). Similarly, where the Commissioner's decision "lacks adequate discussion of the issues," Seventh Circuit precedent requires remand. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (citing cases).

## B.    Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008).[5]  A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009) (quoting 42 U.S.C. § 423(d)(1)(A)). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant

---

[5]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*

presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work?  *See* 20 C.F.R. §§ 404.1520; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Plaintiff urges remand upon the following grounds.

### 1.    RFC Assessment

Plaintiff contends that the ALJ incorrectly found her able to work because his RFC analysis failed to incorporate the full extent of her limitations.  She also argues that he failed to explain what evidence of record supported the limitations that he did incorporate.  The RFC "is an assessment of what work-related activities the claimant can perform despite her limitations, which must be assessed based on all the relevant evidence in the record."  *Varga v. Colvin*, 794 F.3d 809, 812 (7th Cir. 2015).  It "must incorporate all of the claimant's limitations supported by the medical record."  *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).  "Failures to include limitations . . . in the RFC are problematic largely because that omission usually leads to the ALJ neglecting to include the limitations in the hypotheticals [he] poses to the VE, which, in turn, means that the final job figures produced by the VE might not correlate to a Claimant's full suite of limitations."  *Ittel v. Astrue*, No. 2:12-CV-096 JD, 2013 WL 704661, at *14 (N.D. Ind. Feb. 26, 2013).

### a.    Headaches

Plaintiff contends that the ALJ's discussion does not build a logical bridge between the evidence and his conclusion that the RFC need not include a limitation related to her recurrent headaches, which are a classic symptom of Chiari malformations.   The argument is unavailing.   The ALJ's discussion of the medical evidence adequately "connect[ed] all the dots in his analysis" of Plaintiff's headaches, *Cunningham v. Barnhart*, 440 F.3d 862, 865 (7th Cir. 2006), even if the opinion is not a model of organization.   Based on the record, the ALJ questioned whether Plaintiff's headaches were a significant problem at all, and he took particular care to identify inconsistency in her complaints about them.   In the portion of the opinion that expressly discusses Plaintiff's Chiari malformation, the ALJ relied on Dr. Frim's opinion that the condition did not warrant surgical treatment and imposed no serious problems.  (R. 27). The ALJ additionally pointed to normal physical exam findings on September 7, 2012. (*Id.*).   Elsewhere in his discussion of the medical evidence, the ALJ wrote that Plaintiff told Dr. Frim that her headaches were alleviated with Excedrin and rest and that, as of November 8, 2011, she experienced headaches only twice per month.  (R. 28).   The ALJ noted the absence of statements pertaining to headaches during her May 29, 2012 medical appointment, and although she articulated such complaints on September 7, 2012, the ALJ observed in a separate discussion of the September 7 exam that she required only ibuprofen as needed for pain management.  (R. 27-28).  As such, the ALJ adequately bridged the evidence to the absence of headache-related limitation.

Plaintiff urges in a somewhat undeveloped but related argument that the ALJ erred because, by finding that the Chiari malformation was a severe impairment at step

two, he "necessarily found" that the condition significantly limited her work activities and, therefore, was required to incorporate the headaches as a limitation in the step-four RFC assessment. (Doc. 19, at 13). This, too, is a position without merit. Any inconsistency between steps two and four was harmless – if an error at all. The court in *Felker v. Colvin* rejected this same argument, that a step-two finding demanded incorporation of specific limitations findings at step four. No. 13 C 50298, 2015 WL 3832613, at *4 (N.D. Ill. June 22, 2015). Reasoning that a step-two finding of severe impairments is only a threshold requirement, the court pointed out that the Seventh Circuit "has not yet decided whether an ALJ's findings at step four must be consistent with those at step two, . . . ." *Id.*; *see also Guranovich v. Astrue*, 465 Fed. App'x 541, 543 (7th Cir. 2012). As such, Plaintiff's suggestion that the RFC must incorporate her alleged headaches solely because the ALJ deemed the Chiari malformation severe at step two lacks legal support. Because the step-four analysis of the Chiari malformation rests on substantial evidence, as above described, any error here would necessarily arise at step two's inclusion of the Chiari malformation as a severe impairment. Such an error would be harmless since, by deeming the impairment severe, the ALJ merely expanded the possible medical bases for finding disability (which, in effect, increased Plaintiff's likelihood of recovering DIB). *See Stellhorn v. Colvin*, No. 13-cv-1288-CJP, 2014 WL 7156640, at *5 (S.D. Ill. Dec. 15, 2014) (reasoning that inconsistency between steps two and four was harmless error at step two, as the ALJ "cannot be faulted for omitting alleged limitations [in the RFC] that are not supported by the record").

### b. Exertional Limitations

The ALJ found that Plaintiff had several exertional limitations, which he incorporated into the RFC: in particular, she could not climb ladders, ropes or scaffolds but could occasionally climb stairs; she could frequently but not repetitively perform overhead reaching on her right, perform gross manipulations on her right, feel with her right upper extremity, and handle objects on her right; and she must be limited to simple, routine, and repetitive tasks in a work environment free of fast paced production. (R. 26). Otherwise, she could perform the tasks associated with "light work," which involves lifting no more than twenty pounds occasionally and ten pounds frequently, "a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The ALJ's limitations findings mirrored those opined by the State Agency's consulting physicians, except that rather than light work, the consultants suggested her carrying and lifting ability permitted her to perform medium work (and, thereby, light work as well). (*Compare* R. 26 *with* R. 105-07, 118-20); *see also* 20 C.F.R. § 404.1567(c) (stating that any claimant capable of lifting and carrying at the "medium work" level can also perform light work). Notably, the consultants did not suggest any limitation in Plaintiff's reaching and manipulation abilities on the right side. (R. 105-07, 118-20).

Plaintiff argues that the ALJ's discussion of the exertional limitations was inadequate. Although she concedes that the ALJ pointed to additional evidence when he stated that he incorporated greater restrictions than those suggested by the consulting physicians, she maintains that he "did not explain" which evidence in particular supported that decision. (Doc. 19, at 11). The contention is unpersuasive.

Although the ALJ did not discuss the Stroger records by name, he referenced "newly submitted documentation," which in context of the decision can only be the Stroger records. As described, the RFC's exertional limitations differed from those in the consulting physicians' opinions in only two respects: right extremity limitations, and her carrying and lifting ability. Of the records that followed the consulting physician's opinions (dated December 8, 2011 and April 17, 2012), only the Stroger records (dated late 2012 and early 2013) concern Plaintiff's right arm – specifically, shooting pain allegations and related treatment. As the consulting opinions had no restrictions relating to her right extremity, yet the ALJ included such restrictions, it is apparent that the ALJ relied on the Stroger records to supplement the "less restrict[ive]" opinions. (R. 31, 105-06, 119-120). Thus, although the ALJ did not specifically name the Stroger evidence, his use of the phrase "newly submitted documentation" sufficiently identified the evidence upon which he relied.

Plaintiff's suggestion that the ALJ "never indicated what testimony or evidence supported his conclusion that Plaintiff was limited to light work" (rather than the greater restrictions that she alleged) is also without merit. As noted, Dr. Oh and Dr. Gotanco opined that she could perform medium work, and aside from the Stroger records, there is a limited universe of records post-dating the April 2012 opinion by Dr. Gotanco—namely, visits with Dr. Carter on May 2, 2012, June 6, 2012, and August 15, 2012, and notes from May 14, 2012 and May 29, 2012 primary care appointments—that could establish a greater limitation than the one he found. The psychiatric notes after April 2012 contain no meaningful discussion of deterioration in Plaintiff's physical condition, but the primary care notes document the presence of lower back and neck pain for

which she was referred to Stroger for treatment. (R. 450-56). The Stroger records state that medication controlled the pain, but did not fully resolve numbness and tingling. (R. 463, 465, 478). Thus, once again, the ALJ sufficiently identified the evidence—the "newly submitted" Stroger records and the primary care visits—which supported his decision to adopt a greater restriction (*i.e.*, a restriction that would assist Plaintiff's ability to be found disabled at step five) than the limitations proposed by the consultants.

Plaintiff rejoins that there is no single opinion about her carrying limitations that the ALJ accepts. As she argues, he assessed greater restrictions than the consultants (as to her right extremity limitations and carrying and lifting ability) yet he did not accept her allegations of complete incapacity. (Doc. 19, at 11). Thus, in her view, he "found that Plaintiff's functioning was somewhere in the middle, without citing evidence to support that." (*Id.*). This was error, she claims, because the RFC thus lacked the support of any medical opinion. The flaw in the argument is that it overlooks that the RFC assessment need not be entirely based on medical opinions. The RFC is a legal determination reserved to the ALJ, which he is to make in light of medical opinions *and* other evidence, medical and non-medical alike. *Henning v. Astrue*, 578 F. Supp. 2d 996, 1014 (N.D. Ill. 2008). In this case, almost every limitation was drawn from the consulting reports, and Plaintiff does not directly take issue with the particular limitations findings proposed by Dr. Oh and Dr. Gotanco. In the two areas where the ALJ imposed restrictions greater than those found by the consultants, the ALJ sufficiently identified the medical evidence upon which he relied to impose those restrictions – namely, the Stroger records. His RFC finding rests on substantial evidence and is thus free of error.

### c. Mental Limitations

In the RFC analysis, the ALJ noted that Plaintiff could only "occasionally interact with the public, co-workers, and supervisors" and must be limited to "simple, routine and repetitive tasks."  (R. 26).  Similarly, the consulting psychologists found that, as to her social interaction limitations, she was "moderately limited" in her ability to interact with the general public, accept instructions and respond to criticism from supervisors, and get along with coworkers and peers.  (R. 108, 121).  Dr. Gilliland opined that her work environment should be limited only "brief workplace social interaction."  (R. 109).  Dr. Tin agreed.  (R. 122).  Both also opined that she must also be limited to "performing short and simple tasks in a routine setting . . . ."  (R. 109, 122).

Plaintiff argues that the ALJ failed to describe why he limited her to "occasional" workplace social interaction when the consultants opined that she had moderate limitations and could only "briefly" interact with others.  She also objects to his omission of the "routine setting" limitation.  (Doc. 19, at 12-13).  The latter alleged error is merely semantical.  The ALJ limited Plaintiff to "simple, routine, and repetitive tasks," and Plaintiff has not explained how this is different from "short and simple tasks in a routine setting."  However, the ALJ did err when he failed to explain why he incorporated a limitation as to the *frequency* of workplace social interactions when the consulting opinions upon which he heavily relied suggested *durational* restrictions.  "Brief" means "lasting only a short period of time."  *Brief*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/brief  (last visited Nov. 16, 2015).  "Occasional" means "not happening or done in a regular or frequent way."  *Occasional*, Merriam-Webster  Dictionary,  http://www.merriam-webster.com/dictionary/occasional

(last visited Nov. 16, 2015).  This difference in language is not merely semantics.  Under the ALJ's RFC assessment, a job with infrequent or irregular interactions of some substantial length could be characterized as involving "occasional" interactions and thus be available to Plaintiff.  Yet even the least restrictive opinions of record suggested that she would be unable to do such a job given her ability to tolerate nothing more than brief contact with others.

Defendant urges the error is harmless because the jobs the ALJ identified do not require significant interaction with others.  (Doc. 21, at 7).  Here, she relies on the *Dictionary of Occupational Titles* ("*DOT*") as proof of the solitary nature of the positions.  Yet as Plaintiff correctly contends, the *DOT* does not address the level of social interaction required by any one position.  The positions' coding indicates that the "people relation" aspect of the jobs are the lowest level (demarcated by the "8" in the codes' fifth numeral), amounting to nothing more than "taking instructions-helping." *See Parts of the Occupational Definition*, Dictionary of Occupational Titles, 1991 WL 645965.  Even so, this does not speak directly to the duration/frequency issue; the coding instead speaks to the nature of the social interaction (that is, taking instructions) rather than its length or incidence.[6]  As such, Defendant's argument is unsupported and speculative. Application of the harmless error doctrine is thus inappropriate, for the Court cannot be certain that reconsideration on remand will lead to the same result.

---

[6]     The Court notes that the position descriptions reference the *Guide for Occupational Exploration*, which may further illuminate the kinds of social interaction (and other job aspects) required by any given position.  Yet Defendant has neither raised this argument nor cited the *Guide* as a basis for her argument that the positions identified by the ALJ do not require significant interaction. In absence of arguments and clear authority about the *Guide*'s relation to the *DOT* and step-five findings (if any), the Court declines to speculate about what it may or may not establish about these particular positions.

*McKinzey*, 641 F.3d at 893 (finding harmless error where it was "equally obvious that any remand would lead to the same result"). In sum, in making his finding that Plaintiff needed to limit the frequency but not duration of workplace social interactions, the ALJ failed to build a bridge between this finding and the evidence in record, including the opinions of the consultants on which he heavily relied. *Simila*, 573 F.3d at 513. Accordingly, remand is necessary.

### 2.    Dr. Carter's Opinion

Plaintiff next argues that the ALJ erred in the "little weight" he assigned to the opinion of her treating psychiatrist, Dr. Carter. The Social Security regulations govern an ALJ's weighting of medical opinions. 20 C.F.R. § 404.1527(c). A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2010), and he must determine, even when he does not assign controlling weight to a treating physician's opinion, what weight it merits in light of (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ. 20 C.F.R. § 404.1527(c)(2)-(5); *see also Simila*, 573 F.3d at 515. The analysis is a "two-step

process" in which the ALJ first determines whether the opinion deserves controlling weight, and next evaluates the opinion in light of the factors should he decline to assign controlling weight. *Duran v. Colvin*, No. 15 C 50316, 2015 WL 4640877, at *8 (N.D. Ill. Aug. 4, 2015).[7]

For several reasons, the ALJ erred in his evaluation of Dr. Carter's opinion. First, the ALJ wholly omitted any consideration of the factors related to the treatment relationship, exam frequency, and Dr. Carter's specialization, as mandated by the regulations. Dr. Carter was Plaintiff's treating psychiatrist from September 14, 2010 to November 13, 2012 (or beyond), and the record indicates that she had in excess of fifteen visits over this period of time. Since the ALJ's decision does not indicate that he evaluated these factors, the Court is unable to verify that he complied with the requirement to do so. Second, the ALJ's articulated reasons for affording Dr. Carter's opinion little weight, which speak to the "supportability" factor, are unsound and constitute impermissible "cherry-picking" through Dr. Carter's treatment notes. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability . . . .").

In essence, the ALJ provided two reasons for giving "little weight" to Dr. Carter's opinion. The first, in full, was that:

---

[7]     There is an apparent conflict about whether the ALJ must evaluate medical opinions in two separate steps, expressly discussing each of the regulatory factors at the second step. *Compare, e.g.*, *Elder v. Astrue*, 529 F.3d 408, 414-16 (7th Cir. 2008) (finding no error in the ALJ's decision to deny a treating opinion "substantial weight" in a blended analysis) *with Yurt*, 758 F.3d at 860-61 ("the ALJ should explicitly consider the details of the treatment relationship and provide reasons for the weight given to their opinions"); *see also Duran*, 2015 WL 4640877, at *9-10 (explaining the two approaches). The Court notes the conflicting authority but need not adopt an approach because, under either, the ALJ's reasoning was deficient here.

Dr. Carter's opinion is based on the claimant's subjective complaints. For example, in the psychiatric progress report from Aunt Martha's dated January 31, 2012 the mental status evaluation showed a cooperative and appropriate individual. She exhibited normal speech and she did not verbalize any psychosis. She also expressed hope for the future.

(R. 31). The ALJ's reasoning—that Dr. Carter's reliance on Plaintiff's subjective mental health complaints undermines the supportability of his opinion—overlooks that psychological and psychiatric conditions are necessarily and largely diagnosed on the basis of subjective patient complaints. *See* Srab Zahedi, M.D., *Diagnostic Review and Revision*, *in* Oxford Textbook of Correctional Psychiatry 102, 102 (Robert Trestman et al. eds., 2015) ("At its core, psychiatric diagnosis relies on the subjective complaints of the patient and objective signs noted on examination."). As one court has cogently asked, "[h]ow else is a psychologist to evaluate a patient's mental illness, other than talk to [her]? Depression does not show on an x-ray." *Worzalla v. Barnhart*, 311 F. Supp. 2d 782, 797 (E.D. Wis. 2004). Moreover, the ALJ's characterization of Dr. Carter's notes as evidencing sole reliance on subjective statements is inaccurate. Each progress note indicates that Dr. Carter performed a "mental health status exam," which is his own assessment of Plaintiff's condition, including his findings on a given date about her judgment and insight (among other facets of psychological health such as impulsivity, mood, demeanor, speech, and affect). (*See, e.g.*, R. 391). These mental health exams are necessarily based in part on Plaintiff's statements. This is because a mental health professional cannot disregard entirely a patient's statements since these are part of the accepted diagnostic and treatment techniques for psychiatric care. *See* Zahedi, *supra*. Thus, the ALJ's decision to dismiss Dr. Carter's opinion because Dr. Carter relied on Plaintiff's statements was error.

Similarly flawed is the second reason provided by the ALJ for assigning minimal weight to Dr. Carter's opinion. The ALJ wrote:

> Dr. Carter's opinion is even inconsistent with his own treatment findings. For instance, on January 31, 2012 the mental status evaluation showed that the claimant appeared groomed and cooperative with good eye contact, spontaneous speech, and good judgment. She appeared goal directed and organized. In addition, he reported that her anxiety had improved with the use of Ativan. On examination on November 13, 2012, five months after his report, he described her as euthymic without sustained depression despite her report of poor energy and psychosocial stressors. Objectively, she again appeared groomed and cooperative with good eye contact, normal speech, normal motor activity, an appropriate affect, and low impulsivity.

(R. 31) (internal citations omitted).[8] The ALJ's analysis of these treatment notes mischaracterizes their contents. For example, the ALJ stated that the January 31, 2012 notes showed some improvement in her condition – specifically, in her anxiety, mood stability, and judgment (to "good" from "fair"), along with Dr. Carter's impression that she was "future-oriented." However, mere "improvement" does not necessarily mean that Plaintiff was not disabled. As the Seventh Circuit explained in *Murphy v. Colvin*, "[t]he key is not whether one has improved (although that is important), but whether [she] has improved enough to meet the legal criteria of not being classified as disabled." 759 F.3d 911, 819 (7th Cir. 2014). Moreover, these same notes reflect that she cried and spoke of suicidal and homicidal ideation, hallucinations, and psychosocial stressors. (R. 428-29). Based on the ALJ's summary, the visit was free of any evidence of serious mental health issues. Likewise, the November 13, 2012 note is more mixed than the

---

[8] Puzzlingly, the ALJ here characterized certain aspects about Plaintiff's appearance, demeanor, and speech as "objective" indicia of her condition when he, in the very sentences preceding these, identified many of the same appearance characteristics as indicia that Dr. Carter relied upon her "subjective complaints" to the detriment of his opinion's supportability. (*See* R. 31).

ALJ suggested. Again, the ALJ correctly identified portions that reflected some positive improvement, such as the effectiveness of medication and normal aspects of Plaintiff's mental health exam. Yet what he failed to discuss is Dr. Carter's notation, emphasized with three "+" marks, of "psychosocial stressors," that her insight and judgment were only "fair" (a regression from the January 31, 2012 note that he discussed immediately prior, and ignoring the fluctuations during the several visits between those two), and that he instructed her to begin taking Ativan twice daily, an increase from the previous prescription for one tab per day. (R. 449).

The ALJ also overlooked significant evidence in other progress notes that may support Dr. Carter's opinion. By way of two brief examples, Plaintiff reported stress and a relapse in her use of alcohol on May 2, 2012, as well as continued stressors and depression on June 6, 2012, the latter of which caused Dr. Carter to increase her dosage of Prozac. (R. 451, 456). About these and other similar facts, the ALJ was silent. Defendant argues that the ALJ discussed or cited in other parts of his opinion treatment notes "which do not support the limitations assessed by Dr. Carter[,]" and also points to other various facts in the record that purportedly establish that Dr. Carter's opinion was incorrect. (Doc. 21, at 9) (citing R. 29-30). Even assuming Defendant is correct in undercutting Dr. Carter's opinion, the ALJ did not rely on these notes or explain how they supported his finding of inconsistency. Thus, the Court would be required to speculate about the ALJ's view as to how, for example, the fact of Plaintiff's normal speech or ability to perform calculations relates to Dr. Carter's findings that she cannot interact with others in a work environment. To do so would be improper, for it is the ALJ's responsibility to reach and articulate those determinations. In addition,

Defendant's argument is not one that the Court may consider because it is a *post hoc* justification offered by Defendant in the first instance, which violates the *Chenery* doctrine. *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943); *Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010) (discussing a violation of the *Chenery* doctrine from Commissioner's attempts to raise new justifications for the ALJ's decision that were not offered by the ALJ).

It is true, as Defendant argues, that the ALJ need not discuss every one of Dr. Carter's treatment notes to fulfill his obligation to bridge the evidence to his conclusion. Yet Defendant's position here is a weak one, for the ALJ must discuss at least some of the notes in a logical and reasonable way that demonstrates how they support his analysis. In so doing, he cannot ignore lines of evidence contrary to his conclusion. *Simila*, 573 F.3d at 513; *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009) ("the ALJ . . . may not dismiss a line of evidence contrary to the ruling."). Yet that is precisely what happened here. The ALJ cited only two treatment notes, each of which, when examined in full, does not actually support the conclusion he reaches, and he simultaneously disregarded significant evidence in other notes. As a result, this Court is deprived of his view into how Dr. Carter's treatment notes, in their entirety, are so inconsistent with his opinion that the opinion deserves "little weight." Due to these flaws, neither of the ALJ's justifications for disregarding Dr. Carter's opinion is a "good reason" for affording the opinion little weight. Remand is thus necessary.[9]

---

[9] The Court notes in passing that the ALJ also referenced Plaintiff's daily activities of light cleaning, caring for a pet, and driving a motor vehicle when weighting Dr. Carter's opinion. (R. 31). For reasons discussed in the credibility discussion that follows, the ALJ's analysis of the Plaintiff's daily activities was flawed and the related findings are not supported by substantial evidence.

### 3. Credibility Assessment

Finally, Plaintiff argues that the ALJ cited legally insufficient reasons for discrediting her allegations about the extent of her limitations. An ALJ "must justify the credibility finding with specific reasons supported by the record[.]" *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). The regulations require that an ALJ consider objective medical evidence, the claimant's daily activities, allegations of pain, aggravating factors, course of treatment, and functional limitations when making the assessment. 20 C.F.R. § 404.1529(c); *Simila*, 573 F.3d at 517 (citing *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006)). Usually, the court gives deference to the credibility determination, as the ALJ "is in the best position to evaluate credibility." *Simila*, 573 F.3d at 517. An ALJ's "failure to adequately explain his or her credibility finding . . . is grounds for reversal." *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015).

The ALJ found that Plaintiff was "not entirely credible" in her statements regarding the intensity, persistence, and limiting effects of her impairments. (R. 27). In finding her not credible, he considered her daily activities, improvement in her condition with treatment and medication, the record's indication that a business-related layoff led her to stop working, her receipt of unemployment benefits (in which she certified she was "ready, willing, and able to work"), and her continued efforts to find employment following the alleged onset date. (R. 30).

### a. Daily Activities

Plaintiff criticizes the ALJ's reliance on daily activities because evidence of her "minimal activities" is not inconsistent with inability to sustain full-time employment. (Doc. 19, at 18). For this proposition, she relies on a string of cases, including *Bjornson*

*v. Astrue*, 671 F.3d 640 (7th Cir. 2012), in which the Seventh Circuit noted "[t]he critical differences between activities of daily living and activities in a full-time job" and criticized the Commissioner's ongoing "failure to recognize these differences[,]" "a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Id.* at 647.

The Court agrees that the ALJ erred in his analysis of Plaintiff's daily activities. None of the activities he cited—laundry, sweeping, taking out the trash, gardening, walking, driving, bicycling, transporting her nephew to school, gardening, caring for pets, reading, and completing crossword puzzles—conflicts with Plaintiff's contention that she cannot work due to, among other impairments, social interaction problems. Many of these activities are solitary; that Plaintiff can read or complete household tasks is not inconsistent with an inability to interact with others in the workplace. As the Seventh Circuit has "repeatedly warned," most recently in *Hill v. Colvin*, it is "unsound" to liken daily activities of home life to the ability to work full-time. – F.3d –, 2015 WL 7785561, at *6 (7th Cir. Dec. 3, 2015). Defendant's rebuttal, that the regulations permit the ALJ to consider daily activities and that the "record supports the ALJ's finding" is unpersuasive, for nowhere in the ALJ's opinion did he explain these "inconsistencies."

Defendant is correct that the ALJ contrasted certain of these activities with some of her statements. For example, the ALJ deemed inconsistent Plaintiff's claim that she lacked motivation to perform grooming tasks with her admission that she completes some household chores. However, as a matter of logic, one does not preclude the other, and the ALJ did not say anything more to demonstrate this purported inconsistency. Additionally, the ALJ did not point to this ostensible discrepancy (or

others) when making the credibility finding; instead, he placed them in a separate portion of the opinion. Even if he had connected the two, it is not apparent to this Court that the claimed inconsistencies bear on Plaintiff's inability to interact with others (or other alleged limitations), which is ultimately the heart of the inquiry. In other words, rather than internal inconsistency, the ALJ needed to explain how Plaintiff's daily activities supported his conclusion to disbelieve her allegations that she could not sustain full-time employment in light of her particular limitations. His silence on the exact nature of the inconsistencies leaves the Court "to ponder what exactly are these 'inconsistencies' . . ." and, as a result, remand is necessary. *Zurawaski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).

### b. Unemployment Benefits and Plaintiff's Effort to Find Work

The ALJ also erred by pointing to Plaintiff's application for unemployment benefits without adequate discussion. Ordinarily, receipt of unemployment benefits is a proper factor upon which to discount a claimant's credibility. *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005). Yet the Seventh Circuit has cautioned ALJs to evaluate application for and receipt of unemployment benefits within the full circumstances of the application, and also make inquires of the plaintiff about any perceived inconsistency. *Scrogham v. Colvin*, 765 F.3d 685, 699 (7th Cir. 2014)).

The ALJ in this case asked no questions during the hearing about the unemployment application. Nevertheless, his opinion stated: "[t]he fact that she applied for unemployment benefits after the alleged onset date in this case is an implied admission that she felt able to do some sort of work, since the receipt of unemployment compensation requires certification that the applicant is ready, willing, and able to work."

(R. 30).  Perhaps the certification statement is inconsistent, but Plaintiff's own purported belief about her ability to perform some degree of work is not necessarily coextensive with her actual ability to perform that degree of work, or her actual ability to sustain full-time employment.  Furthermore, the ALJ's brief discussion omitted examination of the surrounding facts that may (or may not) render this a non-factor.  Defendant attempts to distinguish *Scrogham* by pointing out that the court there surmised that the plaintiff may not have realized the extent of her limitations at the time of her application, whereas here, Plaintiff did not apply for benefits for over one year following her alleged onset date, presumably with a complete and accurate perception of her impairments.  (Doc. 21, at 12).  What Defendant ignores, however, is that the *Scrogham* court found error in the failure to adequately examine the circumstances surrounding the application.  The error is not limited to the particular facts in that case.  The ALJ in this case, as with the *Scrogham* ALJ, failed to ask her about this perceived inconsistency.  This omission consequently undermines his assessment.

Similarly flawed was the ALJ's reliance on Plaintiff's post-onset work at a library. (R. 30).  His analysis amounted to: "[t]he claimant testified that she worked at a library for a month but fired after one month." (sic) (*Id.*).  Post-onset work is properly considered by the ALJ when assessing credibility.  *Castile v. Astrue*, 617 F.3d 923, 930 (7th Cir. 2010).  Indeed, a reasonable mind may well accept that an individual who is unable to sustain full-time employment would not actively seek or hold employment at a time when she contends she was disabled.  Still, the ALJ should have explained how Plaintiff's job-seeking efforts and her ability to obtain several part-time jobs—each lost in short time—casted doubt (rather than confirmed) her allegation that her physical and

mental impairments prevent her from sustaining full-time work. *See Pierce v. Colvin*, 739 F.3d 1046, 1050-51 (7th Cir. 2014) (rejecting the notion that the ability to work part-time casts doubt on a claimant's credibility, and finding error where the ALJ did not consider the claimant's "unsuccessful attempt" at holding a job). The flaw is not in the result, but once again in the ALJ's failure to explain how he arrived at it given the totality of circumstances.

### c. Business-Related Layoff

The ALJ also relied on Plaintiff's admission that she "stopped working due to a business-related layoff rather than because of the allegedly disabling impairments." (R. 30). This, too, is a proper consideration upon which to question a claimant's credibility. *McKinney v. Colvin*, No. 1:13-cv-01977-JMS-MJD, 2015 WL 274368, at *4 (S.D. Ind. Jan. 22, 2015) (citing *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001)); *Ball v. Colvin*, No. 1:12-CV-00369, 2014 WL 806003, at *7 (N.D. Ind. Feb. 28, 2014) (explaining that a claimant's layoff is part of the "work history," a regulatory factor in the credibility analysis); *Gulley v. Astrue*, No. C 50216, 2013 WL 3200074, at *13 (N.D. Ill. June 21, 2013) (upholding a credibility finding that relied on evidence of a business-related layoff). Like other factors, the ALJ should consider the full context of the layoff when relying upon it to discount credibility, as the fact of layoff alone may not capture pertinent details. For example, in *Buhk v. Colvin*, the court rejected the Commissioner's argument that a credibility finding was substantially justified when the ALJ offered only a cursory analysis of a claimant's layoff from his job. No. 12-CV-615, 2013 WL 1819802, at *4 (E.D. Wis. Apr. 30, 2013). When citing the fact of the layoff, that ALJ "ignore[d] Buhk's explanation in his disability report that he stopped working not only because he

was 'laid off,' but because he was 'feeling poorly and fatigued by the time this job ended.'" *Id.* For that reason, the court held that the ALJ "failed to consider a large body of evidence in assessing Buhk's credibility in violation of [Social Security Ruling] 96-7p, . . . ." *Id.* at *5.

Likewise, the ALJ erred in this case by failing to address the full context of Plaintiff's layoff. There may have been a window of several months between Plaintiff's layoff and her onset date, and within this window, her symptoms may well have worsened to the point that there was no relationship between the layoff and her application for DIB (as the ALJ implied in his analysis). A progress note from Confidential Care, dated March 27, 2010, states that Plaintiff "lost her job" and could not continue going to school. The record is not without inconsistency about the layoff date: other portions, such as the work history report, state that it occurred in June 2010. (*Compare* R. 259 with R. 365). The ALJ did not explain the discrepancy, nor was this issue identified or discussed by the parties. However, given that the medical note was written contemporaneously, a reasonable inference is that the job loss did, in fact, predate her alleged onset date by several months.

If so, this timing tends to give credence to Plaintiff's hearing testimony, in which she stated that, following her layoff, she "got very depressed and stopped school altogether," which she had been attending prior to that time. (R. 50). It is entirely plausible that, in response to the layoff, Plaintiff's emotional condition deteriorated to the point where she was unable to sustain work by the end of June 2010. These considerations may not have altered the ALJ's view of the layoff; indeed, many of the treatment notes from Confidential Care around that time state that Plaintiff was "doing

well." Still, the ALJ was required to evaluate the layoff within relevant circumstances and to adequately articulate his conclusions. His bald citation of this factor, deprived of its factual context, undermines his reliance upon it.

### d. Improvement with Treatment and Medication

Finally, the ALJ relied on Plaintiff's improvement through the use of medication and treatment in discounting her credibility. (R. 30). Once again, the ALJ's analysis is inadequate. That her conditions could be controlled is obviously relevant to the credibility of her allegations, but his conclusory suggestion that the whole of Plaintiff's symptoms were "improved" finds no support in the record.

Defendant urges that the ALJ cited several treatment notes in his discussion of the medical records that described Plaintiff's use of only over-the-counter pain medications for her physical ailments, and that Dr. Carter noted that she was "doing better" once she began taking Ativan. (Doc. 21, at 11). As the Court observed in its analysis of Dr. Carter's opinion, however, Plaintiff's mental health history and Dr. Carter's treatment notes are not so one sided. For example, Plaintiff began taking Ativan in December 2011, and although she and Dr. Carter agreed that it was effective, she described suicidal ideation at the next visit. (R. 429-31). Months later, she relapsed in her alcohol abuse. (R. 456). Eventually, Dr. Carter decided to double her Ativan dosage, which suggests that the medication had not yet controlled her anxiety. (R. 449). The ALJ's superficial credibility analysis of Plaintiff's "improvement" does not address these facts. Similarly, it is not wholly accurate to state that Plaintiff controlled her physical ailments through only over-the-counter medication. When she visited Stroger in late 2012 for shooting pain, she was prescribed amitriptyline, which was

renewed in the most recent medical records. The ALJ's omission of these nuances in his broad conclusion of improvement weakens his reliance on the factor.

Defendant attempts to bolster the ALJ's determination on this point by arguing that the record evidences no hospitalization or emergency room visits by Plaintiff for physical or mental health reasons. The argument is unmoving in part because "there is no requirement in social security law that a claimant require hospitalization in order to demonstrate a severe mental impairment." *Worzalla*, 311 F. Supp. 2d at 796. In addition, this is not a reason the ALJ himself advanced, once again rendering improper Defendant's articulation of it in the first instance. *See Parker*, 597 F.3d at 925. Although Plaintiff's treatment records may well reflect some "improvement," and an ALJ's view of such improvement is a proper reason for discrediting a claimant when supported by substantial evidence, this ALJ failed to connect the dots from the record to his view that significant improvement had occurred and thereby lessened Plaintiff's credibility. As such, remand is required.

## CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. 20) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this Opinion.

ENTER:

Dated: December 10, 2015

_Sheila Finnegan_
SHEILA FINNEGAN
United States Magistrate Judge